**UNITED STATES**

v.

**Senior Master Sergeant George R. PARSONS, United States Air Force.**

**ACM 35500.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 4 Dec. 2002.

Decided 17 March 2005.

Appellate Counsel for Appellant: Major Rachel E. VanLandingham, Major James M. Winner, and Captain Diane M. Paskey.

Appellate Counsel for the United States: Colonel LeEllen Coacher, Lieutenant Colonel Robert V. Combs, and Major Tracey L. Printer.

Before PRATT, ORR, and MOODY, Appellate Military Judges.

OPINION OF THE COURT

PRATT, Chief Judge:

Before a military judge sitting alone as a general court-martial, the appellant pled guilty and was convicted of using and distributing methamphetamine on divers occasions, and possessing methamphetamine on a single occasion, in violation of Article 112a, UCMJ, 10 U.S.C. § 912a. In an additional charge, in violation of Article 80, UCMJ, 10 U.S.C. § 880, again consistent with his plea, the appellant was found guilty of attempting to manufacture methamphetamine.[1] The military judge sentenced him to a bad-conduct discharge, confinement for 24 months, forfeiture of all pay and allowances, and reduction to E-1. Consistent with the provisions of a pretrial agreement, the convening authority approved the sentence as adjudged, except only 22 months of confinement.

On appeal, the appellant asserts (1) that he is entitled to a new post-trial review because the staff judge advocate's recommendation (SJAR) improperly advised the convening authority by (a) incorrectly stating the maximum punishment and (b) incorrectly characterizing the appellant's service; and (2) that the sentence is inappropriately severe. As explained below, we find that the appellant suffered no material prejudice and that the sentence is not inappropriately severe. We affirm.

*Maximum Punishment & Service Characterization*

■ At trial, the military judge, with the concurrence of counsel for both sides, correctly announced that the maximum punishment for the offenses to which the appellant was pleading guilty included 40 years' confinement. *Manual For Courts–Martial,*

*United States (MCM),* Part IV, ¶ 37e (2002 ed.). However, during post-trial processing, the SJAR incorrectly advised the convening authority that the maximum punishment included 51 years' confinement. In addition, the SJAR informed the convening authority that the appellant's service was "above average." The appellant asserts that this was an incorrect characterization of his outstanding service. However, despite having been duly served with a copy of the SJAR prior to submitting clemency matters to the convening authority, neither the appellant nor his counsel addressed either of these alleged errors in their submission. As a result, these alleged errors are waived, unless they are deemed materially prejudicial under a plain error analysis. Rule for Courts–Martial (R.C.M.) 1106(f)(6).

■ In order to find plain error, we must be convinced (1) that there was error, (2) that it was plain or obvious, and (3) that it materially prejudiced a substantial right of the appellant. *United States v. Powell,* 49 M.J. 460, 463, 465 (C.A.A.F.1998). When plain error is asserted, the appellant bears "the burden of persuasion with respect to prejudice." *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). In the context of a post-trial recommendation error, the threshold for material prejudice is said to be low because of the convening authority's vast power in granting clemency. *United States v. Wheelus,* 49 M.J. 283, 289 (C.A.A.F.1998). However, an appellant must make "some colorable showing of possible prejudice." *Id.* at 289. *See also United States v. Kho,* 54 M.J. 63, 65 (C.A.A.F.2000).

■ As regards the misstated maximum punishment, of course, the focus of plain error analysis is on the third prong—prejudice. In his brief, the appellant asserts that, as a result of this error, the convening authority did not have the "proper frame of reference" for evaluating the appellant's clemency request, and that he was "probably less sympathetic." Where, as here, the adjudged sentence to confinement is but a very

---

1. A charge of assault upon his live-in girlfriend was dismissed with prejudice pursuant to a pretrial agreement.

small fraction of both the actual maximum permissible punishment and the erroneous maximum, this argument is specious. On anything other than a purely theoretical level, the potential for prejudice in this setting is negligible, at best; for material prejudice, virtually nonexistent. Although the threshold is justly lowered for post-trial recommendation errors, the plain error doctrine should "be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *United States v. Cousins*, 35 M.J. 70, 75 (C.M.A.1992). This is not such a case.

█ As regards the characterization of the appellant's service, R.C.M. 1106(d)(3) provides that the SJAR shall include, inter alia, "concise information" as to "[a] summary of the accused's ... character of service." No further guidance is provided. Typically, in the Air Force, a staff judge advocate (SJA) uses the characterization made by the unit commander in his or her transmittal of the charges to the next superior commander. R.C.M. 401(c)(2)(A) and its Discussion. In this case, the appellant's commander had occasion to sign two different transmittal documents relating to the appellant. In February 2002, the commander transmitted a single charge and specification for use of methamphetamine, based on the positive results of a urinalysis. In that transmittal document, the commander described the appellant's prior duty performance and conduct as "nothing short of outstanding." When subsequent events led to the discovery of additional offenses, the original charge was withdrawn and replaced by the new set of charges which were the subject of this court-martial. In transmitting those charges, the commander did not specifically characterize the appellant's duty performance, but spoke quite disparagingly about his conduct and its impact on the unit:

> SMSgt Parsons' egregious behavior can only be described as a complete disregard for [Air Force] policy on substance abuse and an embarrassment to the uniform. In addition, he has demonstrated a complete breakdown in judgment and responsibility

in the conduct of his personal affairs, including cohabiting with one woman while he was still married to another woman. His actions bring discredit upon himself, his organization, and the [Air Force]. His conduct is even more disturbing because as one of the most highly respected senior NCOs [Noncommissioned Officers] in the 58 Special Operations Wing, he was in a position to influence the conduct and duty performance of the students and permanent party members of the wing.

In this context, as the government suggests in its appellate brief, it is possible that the SJA used the term "above average" as a means of balancing the very positive language in the first transmittal with the very negative language in the second transmittal. It is worth reminding SJAs that, despite the common practice of garnering characterization language from the transmittal document, there is no requirement that those documents serve as the sole source of such information. R.C.M. 1106(d)(3) simply requires that the SJA include, inter alia, a concise summary of the accused's service record, to include length and character of service. Clearly, if the commander elects to include a service characterization in the transmittal document, that will be a convenient and persuasive source of information. However, the SJA is not bound to adopt the descriptor used by the unit commander. Similarly, if the unit commander unfairly characterizes the accused's service in the transmittal document, or elects not to characterize it at all, this does not free the SJA from his or her responsibility under R.C.M. 1106(d)(3). The SJA has the responsibility to provide a fair and accurate characterization in order to assist the convening authority in the exercise of discretion in deciding what action to take.

In the case sub judice, then, the critical question is not whether the SJAR characterization fairly represented, or even balanced, the contents of the transmittal documents, but rather whether the language chosen by the SJA fairly characterized the appellant's service. The requirement for concise characterization of service could arguably have been satisfied by use of less descriptive word, such as "honorable." Instead, the SJA chose

to use a more qualitative phrase. As the government argues in its brief, the phrase "above average" is not exclusive of outstanding performance. Indeed, in the case of a senior master sergeant, it reinforces what the convening authority already knows by virtue of the rank attained—this is an NCO with a very good record. Although we would not have been surprised if the appellant or his counsel sought to clarify this characterization by pointedly stressing to the convening authority just *how* above average his service had been, we hesitate to call this characterization error. Applying plain error analysis, we do not find error here and, if we did, we would not find it "plain or obvious." And, in any event, in context, we would not find material prejudice, even applying the low threshold discussed above.

### Sentence Appropriateness

Article 66(c), UCMJ, 10 U.S.C. § 866(c), requires this Court to approve only that sentence, or such part or amount of the sentence, as it finds correct in law and fact and determines should be approved. The determination of sentence appropriateness "involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves." *United States v. Healy*, 26 M.J. 394, 395 (C.M.A.1988). In order to determine the appropriateness of the sentence, this Court must consider the particular appellant, the nature and seriousness of the offense, the appellant's record of service, and all matters contained in the record of trial. *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A.1982); *United States v. Alis*, 47 M.J. 817, 828 (A.F.Ct.Crim.App. 1998). This appellant amassed an enviable record of excellence during more than 24 years of service to our Air Force and our nation. We do not discount the fact that his hard work and devotion to his duties may have led to a form of "burn out" and, in turn, contributed to his downfall. However, we also cannot ignore the fact that he elected to react to his problems not by seeking to avail himself of medical or mental health resources, but by turning instead to repeated drug use despite many years of familiarity with the military community's necessary intolerance of such criminal activity. This appellant's drug abuse was extensive, involving the possession, use, and distribution of a dangerous drug. Ultimately, he joined in a scheme to set up a "meth lab" in his home and attempted to manufacture the drug for himself and his live-in girlfriend. His concerted criminal behavior spanned a considerable period of time and included a considerable number of separate occasions on which he consciously chose to violate the law and, in so doing, to shirk his responsibilities as a senior NCO to set a proper example for other airmen to emulate.[2] The stipulated evidence indicates that the appellant continued to use methamphetamine even after a positive urinalysis result led to his arraignment on an initial charge of using the drug. Considering this particular appellant, his record of service, his character, and the nature and seriousness of his offenses, we do not find this sentence inappropriately severe.

### Conclusion

The approved findings and sentence are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred. Article 66(c), UCMJ; *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F.2000). Accordingly, the approved findings and sentence are

AFFIRMED.

---

2. During the providency inquiry and in a stipulation of fact, the appellant acknowledged using methamphetamine "at least 15–25 separate times" between 1 October 2001 and 9 June 2002. He also admitted distributing the drug to his live-in girlfriend, during that same period of time, some 15 to 25 times. The stipulation of fact includes the girlfriend's oral admission to police detectives that she had used methamphetamine in the appellant's presence on at least 50–100 separate occasions, with the drug "normally" provided to her by the appellant.