# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

———————————

No. ACM 39692

———————————

**UNITED STATES**
*Appellee*

v.

**Matthew L. GILLIAN**
Master Sergeant (E-7), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 30 October 2020

———————————

*Military Judge:* Wesley A. Braun.

*Approved sentence:* Bad-conduct discharge, confinement for 19 months, reduction to E-3, and a reprimand. Sentence adjudged 20 February 2019 by GCM convened at Scott Air Force Base, Illinois.

*For Appellant:* Major Yolanda D. Miller, USAF.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Jessica L. Delaney, USAF; Mary Ellen Payne, Esquire.

Before LEWIS, RICHARDSON, and CADOTTE, *Appellate Military Judges.*

Judge RICHARDSON delivered the opinion of the court, in which Senior Judge LEWIS and Judge CADOTTE joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

RICHARDSON, Judge:

A military judge sitting as a general court-martial convicted Appellant, in accordance with his pleas pursuant to a pretrial agreement of one specification each of possessing a Schedule IV substance (Phentermine) and importing a

Schedule III substance (anabolic steroids), both on divers occasions; one specification of assault consummated by a battery on his then-wife HG; and two specifications of communicating a threat to HG, in violation of Articles 112a, 128, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 912a, 928, 934.[1] The military judge sentenced Appellant to a bad-conduct discharge, confinement for 19 months, reduction to the grade of E-3, and a reprimand. The convening authority approved the sentence as adjudged.[2] Additionally, he granted a deferral of mandatory forfeitures until action, then a waiver of mandatory forfeitures for the benefit of Appellant's dependents.

On appeal, Appellant personally raises four issues[3] pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982): (1) whether the military judge considered improper matters in the victim-impact statement of HG; (2) whether trial counsel erroneously argued that Appellant should be punished for crimes for which he was not convicted; (3) whether it was error to omit combat service from the personal data sheet (PDS) provided to the military judge and convening authority; and (4) whether some of the anabolic steroids are considered exempt from the Controlled Substances Act.[4] Appellant requests sentencing relief in the form of setting aside the reduction in rank.[5] We have carefully considered issue (3) with respect to the military judge and issue (4), and determine they warrant no discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). Finding no error materially prejudicial to Appellant's substantial rights, we affirm the findings and sentence.

---

[1] In this opinion we do not distinguish offenses committed before or after publication of the *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM)*, as that distinction does not affect our analysis of the presented issues. Unless otherwise noted, all references in this opinion to the UCMJ and the Rules for Courts-Martial (R.C.M.) are to the 2016 *MCM*.

[2] The terms of the pretrial agreement did not affect the ability of the convening authority to approve the sentence as adjudged. However, it did require the convening authority to withdraw and dismiss a charge and specification alleging a violation of Article 120, UCMJ, 10 U.S.C. § 120, which the Government did after sentence was announced.

[3] Appellant personally raises two issues, which we considered as four distinct issues.

[4] We presume Appellant refers to 21 U.S.C. §§ 801–904, 951–71.

[5] We note that Appellant, through trial defense counsel, requested the military judge sentence Appellant to a punitive discharge and confinement for 50 days. The military judge ensured Appellant understood and concurred with this argument for a bad-conduct discharge.

## I. BACKGROUND

Appellant and his wife, HG, did not have an amicable divorce. As they were planning custody and visitation arrangements for their two children (aged 4 years and 8 years), Appellant engaged in heated arguments with his wife. HG secretly recorded their conversations, expecting to hear confirmation of her suspicion that Appellant was having an extramarital affair. What was captured in the recordings were threats Appellant made to HG to harm her. On the first charged occasion, on or about 15 December 2015, Appellant threatened to injure her by "choking her and knocking her out," and he grabbed HG around the neck with his hands. Appellant made the threatening statements in the presence of their children. The second charged threat occurred five days later, when Appellant told HG he was "going to kill her and burn down her house."

Also recorded was Appellant talking about procuring and using anabolic steroids. Specifically, on 3 February 2016 Appellant told HG, "I'm done with that expensive guy though, I am just going to order it online, do it myself; it is cheaper. . . . It's just illegal to get it. . . . I do it Wednesday and Saturday, and it keeps everything steady, you know and you feel good." In another recording several days later—this time speaking with an unidentified individual about a particular anabolic steroid—Appellant said he "just has to shoot it every other day."

Starting in the spring of 2017, Appellant procured Phentermine by getting prescriptions from multiple civilian doctors over the same time period. His name was flagged by the Tennessee Prescription Monitoring Program for this "doctor shopping." Appellant explained in the guilty-plea inquiry that filling prescriptions from "doctor shopping" is "illegal" and therefore his possession of Phentermine was wrongful. Appellant stipulated to obtaining prescriptions of Phentermine through "subterfuge," and that Phentermine was a "diet pill" that he "enjoyed taking . . . and it gave him an energy 'high.'"

Indeed, Appellant stipulated to numerous facts as summarized in Prosecution Exhibit 1—the Stipulation of Fact—as well as "to the foundation, relevance, and admissibility of Attachments 1–9 and agree[d] to their use should the Government seek to use any of them for the sentencing portion of this general court-martial." Those attachments contained Appellant's prescription history; interview with law enforcement; video and audio recordings regarding steroids, threats, and the assault; photos of text messages offering to get steroids for another; and photographs of Appellant using and injecting anabolic steroids, and of the packages and containers shipped from overseas.

## II. DISCUSSION

### A. Personal Data Sheet

#### 1. Additional Background

The PDS (Prosecution Exhibit 2) admitted at trial without objection and attached to the staff judge advocate's recommendation (SJAR) listed Appellant's "Combat Service" and "Overseas Service" as "None." It also listed several awards and decorations, including the Armed Forces Expeditionary Medal, the Global War on Terrorism Expeditionary Medal, and the Air Force Expeditionary Service Ribbon.

Admitted at trial was a Certificate of Appreciation recognizing Appellant's completion of a four-month tour of duty at Al Udeid Air Base, Qatar, from July to November 2004. Appellant briefly mentioned this deployment during his unsworn statement to the court, explaining he got the idea to become a recruiter while he "was deployed to the desert, lifting weights with this guy" and clarified he "did one deployment to Qatar, you know, to Al Udeid Air Base back in '04.'"

Qatar was a designated imminent-danger pay area throughout 2004. *See* Department of Defense 7000.14-R, *Financial Management Regulation* (DoD FMR), Volume 7A, Chapter 10, Figure 10-1 (Nov. 2018).

#### 2. Law

Proper completion of post-trial processing is a question of law this court reviews de novo. *United States v. Sheffield*, 60 M.J. 591, 593 (A.F. Ct. Crim. App. 2004) (citation omitted). "Failure to timely comment on matters in the SJAR, or matters attached to the recommendation, forfeits any later claim of error in the absence of plain error." *United States v. LeBlanc*, 74 M.J. 650, 660 (A.F. Ct. Crim. App. 2015) (en banc) (citing Rule for Courts-Martial (R.C.M.) 1106(f)(6); *United States v. Scalo*, 60 M.J. 435, 436 (C.A.A.F. 2005)). To prevail under a plain error analysis, an appellant must show "(1) there was an error; (2) [the error] was plain or obvious; and (3) the error materially prejudiced a substantial right." *Id.* (citation omitted). The threshold to establish prejudice from errors which impact an appellant's request for clemency from the convening authority is low, even in the context of plain error analysis; however there must be "some colorable showing of possible prejudice." *Id.* (quoting *Scalo*, 60 M.J. at 437).

Before taking action on a sentence, the convening authority must consider the SJAR. R.C.M. 1107(b)(3)(A)(ii). The SJAR in an Air Force case should contain a copy of the PDS admitted at trial. Air Force Instruction (AFI) 51-201,

*Administration of Military Justice*, ¶ A11.15 (18 Jan. 2019).[6] The Government may introduce a PDS during presentencing as a summary of an accused's personnel records reflecting his "past military efficiency, conduct, performance, and history." *United States v. Holder*, No. ACM 39680, 2020 CCA LEXIS 262, at *8 (A.F. Ct. Crim. App. 7 Aug. 2020) (unpub. op.) (citing AFI 51-201, ¶ 12.26 (18 Jan. 2019)); *see also* R.C.M. 1001(b)(2).

An error in the SJAR "does not result in an automatic return by the appellate court of the case to the convening authority." *United States v. Green*, 44 M.J. 93, 95 (C.A.A.F. 1996). "Instead, an appellate court may determine if the accused has been prejudiced by testing whether the alleged error . . . would have led to a favorable recommendation by the SJA or corrective action by the convening authority." *Id.* (citations omitted).

The Rules for Courts-Martial do not require the SJA to inform the convening authority of an accused's combat service. However, when the SJAR does address such matters, the information must be accurate. *See United States v. Parker*, 73 M.J. 914, 921 (A.F. Ct. Crim. App. 2014) (finding plain error when the PDS omitted any mention of Appellant's combat and overseas service in Qatar and the United Arab Emirates).

"Combat service" on a PDS identifies "service for which the member was awarded 'special pay for duty subject to hostile fire or imminent danger' per DoD 7000.14-R, *Department of Defense Financial Management Regulation*, Volume 7A, Chapter 10." AFI 51-201, Figure A2.11, n. 4.

### 3. Analysis

As Appellant did not comment on the omission of combat service on the PDS in his clemency submission, we review its use in post-trial processing for plain error. If Appellant's personnel records contained sufficient information about his deployment in 2004 to characterize it as "combat service," the PDS was in error by instead indicating "None." However, that fact is not clear from the record.

Appellant's enlisted performance report from the relevant time period states he was a "[p]henomenal AGE dispatch driver in support of Operations ENDURING FREEDOM and IRAQI FREEDOM" and refers to a 120-day deployment, but does not name the location. The Certificate of Appreciation for Appellant's four-month deployment to Qatar was not authenticated at trial, and does not on its face indicate whether it came from his personnel record. In

---

[6] This is the version of AFI 51-201 in effect on the date the personal data sheet (Prosecution Exhibit 2) indicates it was prepared—19 February 2019.

support of his assignments of error, Appellant declared he was deployed to "Qatar in 2004 for a six-month period" and received imminent-danger pay and hazardous-duty pay.[7]

Assuming the omission of Qatar on the PDS provided to the convening authority was plain and obvious error, we find no colorable showing of possible prejudice in this case. *See Scalo*, 60 M.J. at 436–37. Appellant has not attempted to show—nor do we find—that he would have received a favorable recommendation by the SJA or corrective action by the convening authority without the error. The convening authority would have seen from the PDS that Appellant was awarded two expeditionary medals and one expeditionary ribbon, indicating one or more deployments. Even if the PDS listed a four-month deployment to Qatar in 2004 as "combat service," it would have provided no additional information about the nature of the deployment, including any heroic or courageous acts. Appellant made only a passing reference to his deployment during his unsworn statement to the court-martial, and no reference in his request for clemency. While all successfully completed deployments are commendable, Appellant gives us no indication this deployment was especially noteworthy. *See Parker*, 73 M.J. at 921.

## B. Victim Impact Statement

### 1. Additional Background

When trial defense counsel objected to HG's written statement (Court Exhibit a), he cited R.C.M. 1001(c)(2)(B), *Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*). The basis of Appellant's objection was that it contained a "lengthy discussion of things [Appellant ] . . . pled not guilty to" or otherwise contained matters that were not directly related to or arising from the offenses of which Appellant was convicted. After some confusion, and then discussion of R.C.M. 1001(c) (2019 *MCM*) and R.C.M. 1001A, *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), the military judge chose to follow the latter, noting it was "really similar" to the new rule and was "in effect at that time."[8]

HG, through her special victims' counsel, asserted all the incidents described in her unsworn statement were either already in evidence or were related to offenses of which Appellant was convicted. The Government agreed

---

[7] Even assuming we were authorized to consider this extra-record declaration regarding an issue first raised on appeal, we reject Appellant's assertion he was deployed to Qatar for six months. *See United States v. Jessie*, 79 M.J. 437, 444–445 (C.A.A.F. 2020).

[8] We understand the military judge to mean that at the time the offenses were referred to trial by court-martial—5 November 2018—R.C.M. 1001A (2016 *MCM*) was still in effect.

with trial defense counsel that the sexual assaults HG described were outside the scope of permissible victim-impact evidence. The military judge ruled that certain references to sexual assault "be removed from the victim's unsworn statement prior to its delivery." He also stated,

> the court is aware of—and I'll repeat this again at the end, the court is aware of what the accused has pled guilty to and what he is being sentenced [for]. So the court will apply and will give that information the correct weight that it deserves and understands completely that it is only punishing the accused for the offenses to which he has pled guilty.

The military judge repeated this sentiment multiple times. He then accepted a second version of HG's statement (Court Exhibit b), which was redacted in accordance with his ruling and to which trial defense counsel had no additional objections.

HG read Court Exhibit b to the military judge. In sum, the oral and written statements painted a clear picture of domestic abuse and violence, including Appellant's attempts to isolate her. It entwined facts not strictly arising from the convicted offenses. For example, she stated, "All of these things, the emotional and psychological abuse, the threats on my life as well as others, the drugs, the guns, the affairs and the physical assaults, I chose to sweep all of these things to the side when we finally got a divorce." While she did not specifically address the alleged sexual assault, she talked about threats and physical assault, including stating, "Sometimes I would stop at the bathroom and vomit before I made it to bed. I would lie awake wondering if you'd come in to hurt me later." Later, when talking about her fiancé, she said he "dealt with [her] not being able to have sex without crying or struggling to breathe, constantly reminding [her] that he is not [Appellant]." She talked about Appellant and their children,[9] explaining how she saw the effects of his behavior on them, and how now, after the divorce, Appellant routinely ended his allotted visitation time periods early. Finally, she described the long-term effects she suffered as a result of Appellant's behavior towards her.

Immediately after HG returned to the gallery, the military judge stated, "I just want to note as I said I would, Defense Counsel, this court is aware of the

---

[9] "[A] parent responsible for the safety and well-being of children and who witnesses the suffering of those children may be harmed as much as, if not more than, the children themselves. The injury, however, must still directly relate to or arise from the offenses of which Appellant was convicted." *United States v. Dunlap*, No. ACM 39567, 2020 CCA LEXIS 148, at *25–26 (A.F. Ct. Crim. App. 4 May 2020) (unpub. op.), *rev. denied*, No. 20-0243, 2020 CAAF LEXIS 528 (C.A.A.F. 22 Sep. 2020).

constraints of [R.C.M.] 1001A and this court will only consider those matters which are victim impact or mitigation per the requirements of the rule."

### 2. Law

A military judge's interpretation of Rules for Courts-Martial addressing victim-impact statements is a question of law we review de novo. *See United States v. Barker*, 77 M.J. 377, 382 (C.A.A.F. 2018) (citations omitted). We review a military judge's decision to accept a victim impact statement for an abuse of discretion. *See id.* at 383.

A victim has a right to be reasonably heard in a sentencing hearing. Article 6b(a)(4)(B), UCMJ, 10 U.S.C. § 806b(a)(4)(B). A "crime victim" is "an individual who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of an offense of which the accused was found guilty." R.C.M. 1001A(b)(1). A victim may make a sworn or unsworn statement during sentencing in a non-capital case. R.C.M. 1001A(b)(4)(B). An unsworn statement may be oral, written, or both. R.C.M. 1001A(e). Statements offered under R.C.M. 1001A may address victim impact, which "includes any financial, social, psychological, or medical impact on the victim directly relating to or arising from the offense of which the accused has been found guilty." R.C.M. 1001A(b)(2).

Unsworn victim impact statements must comply with R.C.M. 1001A to be presented at sentencing. *See United States v. Hamilton*, 78 M.J. 335, 337 (C.A.A.F. 2019). As they are not "evidence" under R.C.M. 1001A, "the military judge assesses the content of a victim's unsworn statement not for relevance, but for scope." *United States v. Hamilton*, 77 M.J. 579, 586 (A.F. Ct. Crim. App. 2017) (en banc), *aff'd*, 78 M.J. 335 (C.A.A.F. 2019).

When there is error regarding the presentation of victim statements in sentencing, the test for prejudice "is whether the error substantially influenced the adjudged sentence." *Barker*, 77 M.J. at 384 (citation omitted). When determining whether an error had a substantial influence on a sentence, this court considers the following four factors: "(1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *Id.* (citation and internal quotation marks omitted). "An error is more likely to be prejudicial if the fact was not already obvious from the other evidence presented at trial and would have provided new ammunition against an appellant." *Id.* (citation omitted)

"Military judges are presumed to know the law and to follow it absent clear evidence to the contrary. As part of this presumption we further presume that the military judge is able to distinguish between proper and improper sentencing arguments." *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007)

(citation omitted). This presumption holds regardless of whether the military judge notes the improper portions or states what portions he will consider. *Id.*

### 3. Analysis

As an initial matter, we agree that the Rules for Courts-Martial regarding crime-victim matters at issue in this case did not substantially change with the publication of the 2019 *MCM*. Hence, without deciding which version applied to Appellant's sentencing hearing, we conclude that the military judge interpreted the correct language. Moreover, we find that his interpretations were not in error. We will cite to R.C.M. 1001A just as Appellant did in his assignments of error brief.

The victim-impact statement contained some matters that were not clearly "directly relating to or arising from the offense[s] of which [Appellant] was found guilty." R.C.M. 1001A(b)(2). The military judge recognized this. He explicitly stated he would consider only what is allowed under the applicable rule; we have no reason to doubt him.

We decline to hold the military judge should have parsed out any portions that were outside the scope of proper victim-impact matters, whether by requiring redactions or stating exactly which portions would be considered. Moreover, we decline to take on that task ourselves. Mindful of the reality of a military judge-alone sentencing hearing, our decision focuses on the presumptions that the military judge knows the law and will consider only what is proper. We see no evidence to rebut those presumptions; in fact, we see the opposite from the military judge's own words. We find presentation of victim-impact matters outside the scope of R.C.M. 1001A in this judge-alone case had no substantial influence on the sentence, and we are confident that Appellant was sentenced based on proper victim-impact matters.

## C. Trial Counsel's Argument

### 1. Additional Background

In sentencing argument, trial counsel addressed matters that were in evidence, either through the stipulation of fact and its attachments or Appellant's words during the guilty-plea inquiry, but not on the charge sheet. Most of these statements related to drugs, including how Appellant's use of those drugs fueled threats and violence against HG. Specifically, trial counsel argued:

> He could have said no to injecting anabolic steroids into his body. But every step of the way, he said yes. He said yes to crime. He said yes to illicit drugs. Why? Because he liked the way it made him look and feel. He liked feeling big and mighty and he liked being in control, and he used that physical strength to prey on his spouse.

> He broke the law. . . . not while using one drug. But while using multiple drugs, and even offering to give those drugs to others.

At this point, trial defense counsel objected to trial counsel arguing facts not in evidence. Trial counsel responded that an attachment to the stipulation of fact included evidence that Appellant promised to send a female "drugs in the mail even though drugs made him nervous." The military judge agreed with trial counsel and overruled the objection. Trial counsel continued her argument, including these statements, which drew no objections:

> Your Honor, when the steroids weren't enough, the accused turned to uppers, he turned to Phentermine.
>
> . . . .
>
> Your honor, this was not done in the heat of the moment; this was a pattern of abuse. She didn't just have to live and endure the unpredictable, erratic, and violent behaviors of a drug user, but she had to live with an abusive husband as well.
>
> . . . .
>
> . . . Confinement will send a clear message about the unacceptable nature of drug use in the Air Force.
>
> . . . The dishonorable discharge will show [A]irmen that there will be consequences for abusing drugs and abusing your wife.

**2. Law**

"It is appropriate for trial counsel—who is charged with being a zealous advocate for the Government—to argue the evidence of record as well as all reasonable inferences fairly derived from such evidence." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (citation omitted). Trial counsel's argument "must be viewed within the context of the entire court-martial" rather than in isolation. *Id.* at 238 (citing *United States v. Young*, 470 U.S. 1, 16 (1985)) (additional citation omitted). Uncharged misconduct is not "*ipso facto* inadmissible in a case in which an accused has pleaded guilty" and can demonstrate a "course of conduct" directly related to the convicted offense. *United States v. Silva*, 21 M.J. 336, 337 (C.M.A. 1986) (citations omitted).

When an appellant did not object at trial to trial counsel's sentencing argument, courts review for plain error. *United States v. Halpin*, 71 M.J. 477, 479 (C.A.A.F. 2013).

> Plain error occurs when (1) there is error, (2) the error is clear or obvious, and (3) the error results in material prejudice to a substantial right of the accused. Thus, we must determine: (1) whether trial counsel's arguments amounted to clear, obvious

error; and (2) if so, whether there was a reasonable probability that, but for the error, the outcome of the proceeding would have been different.

*United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citations and internal quotation marks omitted), *cert. denied*, 140 S. Ct. 2566 (2019). The burden to establish plain error, including prejudice, is on the appellant. *Id.* at 9, 12. When determining prejudice, we look at the cumulative impact of the improper argument on an appellant's substantial rights and the fairness and integrity of his trial, and weigh three factors: (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the sentence. *See Voorhees*, 79 M.J. at 12; *Halpin*, 71 M.J. at 480.

### 3. Analysis

Trial counsel argued facts in evidence that included uncharged misconduct but were proper matters in aggravation. *See* R.C.M. 1001(b)(4). Why Appellant possessed the drugs is a matter "directly relating to or resulting from" his conviction for drug possession. Therefore, it was proper for trial counsel to argue that Appellant used drugs and offered to give some to another, as well as the effects of his use. Additionally, trial counsel's argument that Appellant was an abusive husband was proper based directly on the threats and assault for which Appellant was convicted, as well as evidence of related misconduct against his wife that provided context to those offenses. That Appellant's drug use played a role in his abusive behavior was a reasonable inference for trial counsel to draw from the evidence.

Assuming trial counsel's argument contained matters outside the proper scope and were plain error, we have considered the test for prejudice in *Halpin* and *Voorhees*, discussed *supra*, and find presentation of these matters to the military judge did not substantially influence Appellant's sentence nor otherwise materially prejudice a substantial right of Appellant. We emphasize again the presumption that the military judge knows the law and recognizes improper argument, and will consider only what is proper. Again, in this military-judge-alone case we see no evidence to rebut those presumptions. Any error in trial counsel's argument was not severe, and the military judge's measures to address it were sufficient. While uncharged misconduct comprised a substantial portion of the facts in evidence, trial counsel tied that conduct to the charged offenses as matters in aggravation. We are confident that Appellant was sentenced based on proper evidence and argument alone, and there is no reasonable probability that, but for any improper argument, the outcome of the proceeding would have been different.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court